**Walker Boyd FITE, Plaintiff–Appellee,**

v.

**FIRST TENNESSEE PRODUCTION CREDIT ASSOCIATION, Defendant–Appellant.**

Nos. 87–5728, 87–5805.

United States Court of Appeals, Sixth Circuit.

Argued May 17, 1988.

Decided Nov. 4, 1988.

Rehearing and Rehearing En Banc Denied Jan. 24, 1989.

Charles L. Trotter, Jr., Huntingdon, Tenn., Charles Hampton White (argued), Cornelius & Collins, Nashville, Tenn., for defendant-appellant.

Roger Keith Rutledge (argued), Memphis, Tenn., for plaintiff-appellee.

Before KEITH and WELLFORD, Circuit Judges, and EDWARDS, Senior Circuit Judge.

KEITH, Circuit Judge.

Appellant, First Tennessee Production Credit Association ("FTPCA"), appeals from a jury verdict in favor of Appellee, Walker Boyd Fite, in this action brought pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Appellant also appeals from the jury's award of damages totaling $270,000 and the district court's award of attorney's fees and costs in the amount of $71,373.93. For the reasons set forth below, we affirm the judgment of Judge Julia Smith Gibbons.

## I.

On October 30, 1984, appellee brought suit against appellant, his employer of record, and the Federal Intermediate Credit Bank ("FICB"),[1] alleging that he had been discharged in violation of the ADEA.

In the course of discovery, both FTPCA and FICB objected to the disclosure of certain information contained in or relating to credit reviews which were claimed to be privileged. Appellee sought an order compelling the discovery, which was granted by the United States Magistrate on January 7, 1986. In the appeal of the magistrate's ruling to the district court, FTPCA and FICB were joined by the United States, which filed a Suggestion of Interest asserting that the credit reviews were deemed under regulations of the Farm Credit Administration to be governmental records covered by a privilege against disclosure. After conducting a hearing, the court, on March 4, 1986, entered an order compelling both FICB and FTPCA to comply with the discovery request. When FTPCA failed or refused to abide by the order compelling discovery, appellee sought and obtained attorney's fees as sanctions.[2]

---

1. Based on FICB's exercise of supervisory authority over appellant, appellee filed suit against it under the "single employer" doctrine. *See Armbruster v. Quinn,* 711 F.2d 1332 (6th Cir. 1983).

2. In connection with this dispute, on December 16, 1986, the magistrate, pursuant to an order of reference, denied a motion of the United States for a protective order to preclude the introduction into evidence of information obtained from the United States concerning the financial condition of FTPCA.

Prior to trial, FICB filed two motions for summary judgment on the issue of liability to appellee. The court denied both motions. However, on April 23, 1986, the court granted FICB's motion for partial dismissal of appellee's claims for punitive and liquidated damages.

Upon the completion of discovery and preliminary motions, a jury of seven persons was impaneled, and on February 9, 1987, the trial commenced. At the close of appellee's case-in-chief, FTPCA and FICB filed motions for a directed verdict. The court denied these motions. At the conclusion of all the proofs, FTPCA and FICB again moved for directed verdicts. The court denied FTPCA's motion, but granted a directed verdict to FICB on the "single employer" issue.

The court then charged the jury, which deliberated and on February 13, 1987, found in favor of appellee and assessed damages in the amount of $270,000. The court entered judgment on February 19, 1987. On February 27, 1987, FTPCA moved for a judgment notwithstanding the verdict ("JNOV") or a new trial. On April 9, 1987, appellee moved the court for an award of attorney's fees to cover all services rendered in connection with the litigation. The court entered an order on May 22, 1987, denying FTPCA's motion for JNOV or a new trial and awarding attorney's fees in the amount of $69,378.75, plus $1,955.88 in costs.

## II.

FTPCA is a corporation with its principal office in Covington, Tennessee. It is part of the Farm Credit System, and its chief function is to lend money to assist farmers in their farming operations.

3. As vice president-credit, appellee was responsible for overseeing credit administration, but was not solely responsible for decisions concerning whether to extend credit. Thus, he could not be held solely responsible if a loan went into default.

4. Minutes from the meeting of the Board on April 14, 1980, show that German recommended that appellee be assigned as assistant county manager for Shelby and Ipton Counties. The Board approved Gerald Friedman as vice presi-

Appellee was employed by FTPCA for nineteen years. FTPCA forced appellee to take early retirement effective December 31, 1983. At the time his employment ended, appellee was fifty-seven years old and was assistant vice-president for related services. Appellee served in this capacity for three years. Prior to that, he served as vice president-credit. While appellee was vice president-credit, FTPCA received credit quality ratings of ninety percent acceptable or better from FICB.

Appellee worked in the central headquarters office in Covington when he was vice president-credit. Loans originating from the county field offices would typically be approved at the county level if they did not exceed a certain amount. Larger loans were approved at the central office by the loan committee, which was composed of the president of FTPCA, the vice president of credit and the chairman and vice chairman of the Board of Directors ("Board").[3]

One of the county managers for FTPCA while appellee was vice president-credit was Michael H. Moore. In the Spring of 1980, Bobby German, president of FTPCA, found what he thought were falsified reports by Moore in the Ripley office files. German fined Moore and called in the Federal Bureau of Investigation ("FBI"). Because appellee initiated some of the questioned reports, German concluded that he was involved.

No criminal prosecution resulted from the FBI investigation, and German's two attempts to remove appellee from his position were rejected by the Board.[4] German resigned as president of FTPCA effective June 1, 1980.[5] The Board elected Frank

dent and credit supervisor, with appellee as assistant vice president and assistant credit supervisor. Joint Appendix at 995.

5. German claims that he resigned out of frustration over the matter concerning appellee. However, the record shows that German also resigned because he did not want to follow the Board's recommendation that he move to Covington. Joint Appendix at 995. Also, following German's announcement of resignation, the

Burnett to succeed German. Burnett made several changes in personnel assignments, including the transfer of appellee to assistant vice president for related services and the assignment of William McQueen to vice president-credit.[6] As vice president for related services, appellee was responsible for handling loans in the process of liquidation (215 loans), as well as public relations. Appellee was also in charge of the crop hail insurance program and the FTPCA magazine. This new position increased appellee's workload and elevated him in the chain of command, although his salary and benefits remained the same.

The farm economy declined during 1980 through 1983, and FTPCA had an increasing number of problem loans. Such loans failed due to the declining economy, as well as bad judgment on the part of county managers and central office personnel on the loan committee. Credit reviewers from FICB identified and analyzed problem loans, but their analysis did not provide sufficient information to ascribe fault to a particular individual.

In 1983, FTPCA merged with the Jackson Production Credit Association. Burnett chose the occasion of the merger to resign as president. Burnett's successor, Wayne Giles, assumed the presidency in Covington on May 16, 1983. On October 26, 1983, Giles approached appellee about retiring early.[7] Giles insists that he mentioned job performance as a reason for the recommended retirement. Appellee, however, states that Giles only talked about the fact that FTPCA was losing $20,000 to $30,000 per month and that he was attempting to balance the budget. Giles did

not deny that talk of the budget may have come up.[8]

On December 26, 1983, appellee entered a hospital with a kidney stone; he remained in the hospital until January 1, 1984. After returning home, his sick leave was extended due to a reaction to medication. On January 5, 1984, Giles called appellee at home and informed him that he had retired appellee effective December 31, 1983.[9] Giles offered to trigger appellee's retirement benefits; appellee told Giles that he would be in the office the following Monday to get things straightened out.

Appellee reported to work on Monday and was again informed by Giles that he was retired. Appellee asked for a letter explaining why he was being terminated. Three days later, on Thursday, Giles furnished the letter. Appellee claims that his receipt of this letter was the first time that he was put on notice that his job performance was poor. Appellee claims that Giles had neither administered any performance evaluations, nor had he given any warning letters or reprimands, despite the specific provisions for such in § 235 of the FTPCA employer manual.

Appellee's claims are supported by the testimony of Giles. Prior to appellee's termination, Giles did not comment on his job performance. Giles admits that he knew nothing about appellee's job performance. Giles further admits that prior to the time he approached appellee about taking early retirement, he talked with appellee only once about the quality of appellee's work. This discussion occurred when appellee was

---

Board named appellee acting vice president-credit.

6. Burnett testified that FTPCA was in the process of changing credit forms, and he thought McQueen would be better able to handle the new forms.

7. Within a week after approaching appellee about early retirement, Giles approached another employee, Virginia Collins. Collins was over 55 years old and had worked 25 years with FTPCA. Giles informed Collins that he wanted to make cutbacks and suggested that she take early retirement, effective December 31, 1983. Collins voluntarily retired.

8. During this same period, Giles remarked to McQueen that he was having trouble getting the budget prepared because FICB would not give its approval with appellee's salary in it. McQueen further stated that Giles never talked to him about appellee's job performance.

9. During the same period, Giles also terminated the former president of Jackson Production Credit Association, Howard Pierce, age 57. Giles also wanted to terminate Bill Kirk, age 51, but instead demoted him from vice president to field office manager. According to McQueen, Giles did not approach anyone concerning termination who was not of retirement age.

attending a bankruptcy involving a $2,000 loan, and Giles suggested that appellee might better use his time on the larger accounts.[10]

After Giles terminated appellee, he assigned each of the three vice presidents in the credit department to handle the 215 accounts. This resulted in an increased workload for the vice presidents. To compensate for this, Giles moved the manager of the Hardemna County office, Frank Moore, into the central office at Covington. Giles assigned him to do loan analyses or precalculations on new loan packages coming in from the field offices, duties which were previously handled by the vice presidents. Moore also took over the hail crop insurance program and the FTPCA magazine. Moore was in his early thirties.

Following his retirement, appellee maintained his desire to be reinstated. Thus, he made only a few contacts about temporary employment. However, in the second year following his retirement, he began making applications for other jobs. Appellee made about twenty-eight applications in all and accepted a temporary position with the State of Tennessee as a property appraiser. He commenced employment on January 20, 1987, in Tipton County. The job paid approximately $924 per month.

### III.

A. *Motion For Directed Verdict At End Of Appellee's Case-In-Chief*

 In an age discrimination case, the plaintiff carries the ultimate burden of persuasion to establish by preponderance of the evidence that, as an individual protected by the ADEA, he was dismissed because of his age. *Wilkins v. Eaton Corporation*, 790 F.2d 515, 520 (6th Cir.1986). Although there may be more than one reason for an employee's discharge, a plaintiff can prevail if he shows that " 'but for' his employer's motive to discriminate against him because of his age, he would not have been discharged." *Id.* (quoting *Loeb v.*

*Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir. 1979)).

FTPCA argues that the lower court erred in denying its motion for a directed verdict at the end of appellee's case-in-chief. We disagree.

 To make out a prima facie case of discrimination, thereby avoiding a directed verdict at the close of plaintiff's evidence, a plaintiff must establish that: (1) he was a member of a protected class; (2) he was discharged; (3) he was qualified for the position; and (4) he was replaced by a younger person. *Wilkins*, 790 F.2d at 520 (citations omitted). In applying the above test to this case, we find that appellee established a prima facie case.

Appellee established that at age fifty-seven, he was a member of the ADEA protected class. Appellee's testimony, plus the testimony of McQueen, Robert Wooten (the Chairman of the Board of FTPCA) and Burnett, established that appellee performed his job satisfactorily, and there had been no criticism of his performance. It is undisputed that appellee was forced to retire effective December 31, 1983, and the testimony of McQueen established that Frank Moore, an employee in his early thirties, was hired to perform a portion of appellee's duties and to do loan precalculations so that the three vice presidents could take over the 215 accounts. Thus, we find that the lower court did not err in denying FTPCA's motion.

B. *Motion For Directed Verdict At Close Of All Evidence And Motion For Judgment Notwithstanding The Verdict*

This court has set forth the standard of review on appeal from the denial of a motion for directed verdict:

Evidence is sufficient to preclude granting a motion for directed verdict when, in reviewing the evidence in the light most favorable to the non-moving party, it would permit a reasonable jury to find in favor of that party.

---

**10.** Giles stated that in the five months of his tenure before he approached appellee about retirement, Giles was traveling to all of the county offices and was preoccupied with cutting costs because of FTPCA's poor financial condition.

*Rose v. National Cash Register Corp.,* 703 F.2d 225, 227 (6th Cir.), *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983) (citation omitted). Thus, "if, from 'the facts presented in plaintiff's proofs there [is] simply no reasonable inference to suggest that plaintiff was discriminated against because of his age,' then plaintiff has failed to present a *prima facie* case and the trial court is required to direct a verdict for defendant."[11] *Id.* (quoting *Sahadi v. Reynolds Chemical,* 636 F.2d 1116 (6th Cir.1980)).

■ The ultimate issue in this age discrimination suit is whether age was a determining factor in the employer's decision to fire appellee. *Blackwell v. Sun Electric Corp.,* 696 F.2d 1176, 1180 (6th Cir.1983) (citation omitted). As we stated earlier, a plaintiff must make out a prima facie case of discrimination. *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). We have determined that appellee established a prima facie case of age discrimination. Once plaintiff has established a prima facie case, "the burden shifts to the employer to produce a non-discriminatory reason for his decision. The ultimate burden of proving discrimination ... remains with the plaintiff." *Blackwell,* 696 F.2d at 1180 (citing *Texas Department of Community Affairs v. Burdine* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1980)). Thus, if the employer carries this burden, plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were merely a pretext for discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1980).

■ FTPCA argues that the lower court erred in denying its motions for directed verdict and JNOV because appellant articulated non-discriminatory reasons for its decision to terminate appellee. FTPCA alleges that it proved at trial that the termination resulted from: (1) appellee's prior job performance; and (2) the financial plight of FTPCA. Thus, FTPCA argues that "the evidence '[did] not suffice to support as a reasonable probability the inference that but for claimant's age he would not have been discharged.'" *Wilkins,* 790 F.2d at 523 (quoting *Lovelace v. Sherwin-Williams Co.,* 681 F.2d 230, 239 (4th Cir. 1982)). We disagree.

FTPCA argues that the evidence was overwhelming that appellee's performance was marginal and was the subject of criticism by FICB credit reviewers for three years. FTPCA further argues that Burnett, under no circumstances, would assign appellee the job of credit supervisor, and the 215 accounts were being supervised in an improper manner. Thus, FTPCA argues that prior job performance, not age, was the overriding factor leading to the termination.

We note, however, that by evidence introduced in his case-in-chief, the jury could reasonably have found that appellee effectively demonstrated pretext. Appellee introduced evidence, through his testimony and that of McQueen and Burnett, that his work record was good. This evidence was corroborated by Wooten. Also, in cross-examination, Giles could not and did not deny that appellee had never received an unsatisfactory rating. Furthermore, the fact that appellee received pay increases from 1981 until his forced retirement in 1983 demonstrates that his work was acceptable to FTPCA.

Evidence relating to the credit reviews performed by FICB reviewers, William Taylor and Allen Moore, was used by FTPCA to show that appellee failed in the management of loans during his tenure as vice president-credit and in his subsequent management of the 215 accounts. However, the record shows that the reviews were "snapshots" which did not show who had made loan decisions. Moore and Taylor corroborated the testimony of appellee that many people were involved in the loan process, from the county manager to the central office credit supervisor and the loan

---

11. The standard for granting a JNOV is the same as that for a directed verdict. *Hill v.* *Spiegel, Inc.,* 708 F.2d 233, 237 (6th Cir.1983).

committee, including the president and chairman of the Board. Also, under cross-examination, Taylor admitted that in his evaluation of the administration of the 215 accounts, he had not analyzed the special problems associated with dealing with farmers in liquidating loan accounts. He further stated that he encountered many problems with difficulties in repayment of the 215 accounts in his examination of other credit associations.

Evidence concerning Burnett's decision to assign appellee to the position of vice president for related services shows that FTPCA had just gone through a complete change of forms, and Burnett felt that McQueen could adapt to change faster. McQueen testified that appellee had not been trained with the new forms. According to Burnett, appellee's new assignment resulted in a heavier workload, was not a demotion, and moved him up the chain of command.[12]

FTPCA contends that its desperate financial plight prompted the termination of appellee, an employee whose value to the company was questionable. The law is clear that "[a] business decision need not be good or even wise. It simply has to be nondiscriminatory, for the only kind of business decision that the ADEA prohibits is a business decision that discriminates against the aged." *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 20 (7th Cir.1987) (citation omitted). Thus, had appellee simply contended that FTPCA used poor business judgment in terminating him, he "would not have alleged a violation of the ADEA." *Id.* at 21, However, appellee does not allege poor business judgment, and, indeed, the bulk of FTPCA's brief is devoted to proving that the termination was the result of poor performance. As stated above, we find that the jury could have reasonably concluded that FPTCA's performance argument was a mere pretext. Thus, we find that the lower court did not err in dening FTPCA's motions for directed verdict and for a JNOV.[13]

## IV.

Appellee requested damages in the amount of $277,054. The record shows that computed at the salary he was receiving as of December 31, 1983, appellee would have earned $217,053 from the above date until his retirement at age sixty-five, as well as hospitalization insurance premiums totaling $7,360, contributions to his thrift plan account totaling $6,300, and interest on his thrift plan account totaling $13,022. Also, if appellee had not been forced to retire, he would have retained his thrift plan principal, totaling $33,321. The jury returned a general verdict and judgment for $270,000, which included an award of front pay.

■ FTPCA argues that the district court erred in denying its motion for a JNOV or a new trial on the issue of the award of front pay. FTPCA specifically argues that appellee's failure for a period of one year to seek employment established

---

**12.** Appellee effectively countered FTPCA's testimony by German and Winters regarding appellee's involvement in the Michael Moore incident. The record shows that the FBI investigation of Moore resulted in no criminal prosecution. Testimony showed that appellee's initials on the documents in question indicated that appellee had seen the documents, not that he had approved or verified the loan.

Also, German's assertion that he resigned as president because the Board retained appellee was tempered by the fact that he had refused for personal reasons to comply with the Board's request that he move from Memphis to Covington in conformity with the FICB audit recommendation.

**13.** We find that FTPCA's argument that the lower court erred in denying its motion for a new trial has no merit. FTPCA argues that the only evidence of discrimination that was offered was the testimony of Virginia Collins; it argues that this testimony was not sufficient to support the verdict.

The grant or denial of a motion for a new trial is within the sound discretion of the district court and will not be disturbed absent a clear showing of abuse of discrimination. *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433 (4th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986). We find that no abuse of discretion occurred in this case. As mentioned, *supra*, section IIIB, sufficient evidence existed to convince a reasonable jury that FTPCA discriminated against appellee because of his age. Thus, we find this argument to lack merit.

a failure to mitigate damages, thereby forfeiting any right to front pay which may have otherwise been available. *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). We disagree.

Testimony at the trial showed that appellee postponed seeking other employment for a year in the expectation that he would be reinstated. However, when it became apparent that this would not happen, he vigorously sought other employment, submitting approximately twenty-eight applications. He accepted the first job offer that he received, a temporary position as a property appraiser for the State of Tennessee. In *Dominic v. Consolidated Edison Co.*, 822 F.2d 1249, 1258 (2d Cir.1987), the court held that the lower court judge did not abuse his discretion in finding that two years was a reasonable amount of time for plaintiff to find comparable employment. In this case, appellee was terminated on December 31, 1983, and commenced employment as an appraiser on January 20. 1987. Thus, we find that appellee effectively mitigated damages.

FTPCA further argues that the district court erred in instructing the jury that it could, in its discretion, award front pay.[14] FTPCA vigorously argues that it is for the court, and not the jury, to determine the amount of front pay. We disagree.

■ This court and other courts of appeals have approved front pay as appropriate relief in discrimination actions brought pursuant to the ADEA. *See Davis v. Combustion Engineering Inc.*, 742 F.2d 916 (6th Cir.1984); *Whittlesey v. Union Car-*

*bide Corp.* 742 F.2d 724 (2d Cir.1984); *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093 (8th Cir.1982). In *Davis*, we noted that:

> [A]n award of front pay must be governed by the sound discretion of the trial court and may be not appropriate in all cases. For example, the award of front pay to a discriminatorily discharged 41 year old employee until such time as he qualifies for a pension might be unwarranted. On the other hand, the failure to make such an award for an employee age 63, likewise discriminatorily discharged, might be an abuse of discretion.

*Id.* at 923. We concluded that the award of prospective damages was proper because " '[h]e [plaintiff] is presently 59 years of age and ... has but approximately six years until he would be faced with mandatory retirement.' " We further noted that plaintiff's prospects for future employment with the defendant company were dim. *Id.* (quoting Memorandum Opinion, Joint Appendix at 145).

In the present action, appellee was fifty-seven years of age when he was terminated and sixty years of age at the time of the trial. The lower court determined that equitable relief, reinstatement, was not appropriate. Accordingly, the court concluded that front pay was an available remedy. We find that, pursuant to *Davis*, the lower court did not abuse its discretion in finding that appellee was entitled to front pay. Thus, we now turn to the question of whether the district court erred in instructing the jury to determine the amount of front pay to be awarded.

■ FTPCA contends that the task of determining the amount of front pay is for

**14.** The court instructed the jury as follows:

> In addition, you may consider whether you should award the plaintiff any salary and benefits he would have received in the future. Whether or not plaintiff should be given an award for future pay and benefits is within your sound discretion, and in making this decision you should consider all the facts and circumstances in this case.
>> In deciding whether the plaintiff is entitled to an award of future pay and benefits, you may consider, among other factors, the availability of employment, the period within which the plaintiff by reasonable efforts may be re-employed, plaintiff's working life expectancy and

> plaintiff's duty to mitigate. Mitigate is a word you have not heard before, and I will be explaining it to you in just a minute, this duty to mitigate.
> If you award the plaintiff future salary and benefits, any sums so awarded must be reduced to their present value. Further, you may not award the plaintiff any future salary and benefits based on sums he would have received beyond the normal retirement age of 65. Any award of future salary or benefits you may make is limited to the amount required to place plaintiff in the position he would have occupied in the absence of discrimination.
> Joint Appendix at 891–92.

the court and not the jury. *See Dominic,* 822 F.2d at 1257; *Gibson,* 695 F.2d at 1100; *Wildman v. Lerner Stores Corp.,* 771 F.2d 605 (1st Cir.1985). In *Dominic,* the Second Circuit stated:

> Dominic nevertheless argues that once the trial judge has found an award of front pay to be appropriate, the amount reasonably necessary to compensate the plaintiff is a factual issue that must be submitted to the jury under the ADEA. We disagree....
>
> ....
>
> ... In the present case ... front pay is a matter for the exercise of the trial judge's equitable discretion.

*Dominic,* 822 F.2d at 1257–58 (citation omitted). In *Wildman,* the First Circuit held that "[b]ecause future damages are often speculative, the district court, in exercising its discretion, should consider the circumstances of the case, including the availability of liquidated damages." *Wildman,* 771 F.2d at 616. In *Gibson,* the court concluded:

> After the jury trial on the foregoing damages issue, the district court should reconsider [plaintiff's] request for equitable relief. The equitable relief that the district court may grant includes ... additional pension benefits, reinstatement, and monetary damages in lieu of reinstatement.

*Gibson,* 695 F.2d at 1100 (citations omitted). Thus, several circuits support FTPCA's position.

However, FTPCA's contention that front pay is not a question for the jury is at odds with the authority of this circuit. Indeed, *Davis* was an action where the jury determined the amount of front pay. In upholding the award of front pay, we noted that "[b]ased upon such determinations by the trial court, this court holds that the approval of the prospective damage award of $88,800 *as returned by the jury* was not an abuse of discretion." *Davis,* 742 F.2d at

923 (emphasis added). Thus, we find tha FTPCA's argument has no merit.

■ FTPCA next argues that the jury's award of front pay was speculative because there is no basis in the record for the award. FTPCA cites *Shore v. Federal Express Corp.,* 777 F.2d 1155 (6th Cir.1985), for support.

In *Shore,* this court stated that:

[S]ome basis must appear in the record for such an award. Some of the factors which district courts have employed to alleviate the speculative nature of future damage awards include an employee's duty to mitigate, "the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and other factors that are pertinent in prospective damage awards."

*Shore,* 777 F.2d at 1160 (quoting *Koyen v. Consolidated Edison Co.,* 560 F.Supp. 1161, 1168–69 (S.D.N.Y.1983)).[15] FTPCA argues that appellee offered no evidence concerning the condition of his health, his expected mortality, and the present value of any future salary or retirement benefits. It further argues that there was no evidence as to the availability of employment in the western area of Tennessee or the period of time in which appellee could be re-employed. We disagree.

Appellee testified concerning the good condition of his health. Also, evidence concerning appellee's duty to mitigate damages is reflected by the fact that appellee diligently sought and found employment with the State of Tennessee after he determined that he would not be reinstated. Furthermore, concerning evidence presented to demonstrate the availability of employment in the western area of Tennessee, the record shows that testimony from German indicated it would be difficult to find comparable employment in rural Tipton

---

15. We note that the district court correctly instructed the jury concerning these factors. The district judge's prudent exercise of careful attention on this issue is reflected in the colloquy with counsel prior to the charge. The judge recited the facts in this case which made front pay an appropriate remedy, heard from counsel in the issue, and expressly referred to the facts set forth in *Shore.* *See* Joint Appendix at 866–75.

County. Finally, with regard to a determination of the present value of future salary and retirement benefits, counsel for appellee made it clear that "the proof that we allege is based on not future values but based on present value." Joint Appendix at 875. The court agreed. Thus, we hold that the record contains sufficient evidence to sustain the jury's award of front pay.

## V.

Appellee was awarded attorney's fees and costs in the amount of $71,373.93. The total figure was the result of the number of hours expended on the case multiplied by the attorney's hourly rate and then multiplied by 1.75. FTPCA argues that the district court erred: (1) in allowing appellee attorney's fees for all services rendered; and (2) in enhancing the fee by a multiplier of 1.75. We will address each argument in turn.

■ FTPCA does not dispute the reasonableness of appellee's attorney's hourly rate; rather, FTPCA argues that any award based on action taken against defendants other than FTPCA should be declared void. Appellee spent a portion of his time unsuccessfully litigating the matter of FICB's status as a single employer with FTPCA because of FICB's alleged supervisory relationship with FTPCA. A directed verdict was granted in favor of FICB on this issue. Also, appellee spent time attempting to obtain, through discovery, credit reviews against FTPCA, FICB and the federal government, which had filed a Suggestion of Interest asserting that the credit reviews were deemed to be privileged pursuant to governmental regulations.

Where a plaintiff is deemed "prevailing," even though he succeeded on only some of his claims for relief, two questions must be addressed. "First, did the plaintiff fail to prevail on claims that were unrelated to claims on which he succeeded?" *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). In this regard, "work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result

achieved.'" *Id.* at 435, 103 S.Ct. at 1940 (quoting *Davis v. County of Los Angeles*, 8 Empl.Prac.Dec. (CCH) § 9445, 9445 (C.D. Cal.1974)) [available on WESTLAW, 1974 WL 180]. The second factor dictates that, where a plaintiff has obtained excellent results, his attorney should receive a fee for all hours expended on the litigation. *Id.* "[T]he fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Id.* (citation omitted).

In the present action, we find that the district court did not commit error. We agree with the district court that:

> [T]ime spent litigating the issues of governmental privilege and the single employer doctrine was sufficiently related to the ADEA claim on which plaintiff prevailed to satisfy the first factor of *Hensley*, since time spent on those issues was "expended in pursuit of the ultimate result." *Id.* [*Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940]. Moreover, the success achieved was sufficient to satisfy the second factor, Plaintiff received essentially complete relief. Simply because plaintiff did not prevail on all the issues raised in his complaint and did not get judgment against all of the originally named defendants does not alter the fact that he is a prevailing party entitled to be reasonably compensated for all time spent on a matter.

Joint Appendix at 96 (citations omitted).

■ FTPCA argues that the lower court erred in allowing the fee to be multiplied by 1.75. FTPCA argues that the district court did not adhere to the Supreme Court's mandate in *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), that the use of a multiplier required a finding that the quality of plaintiff's counsel was superior, plaintiff's success was exceptional, or that the questions presented were either novel or complex. Thus, FTPCA argues that the factors employed by the court—the contingent nature of the arrangement and the amount of time expended on the case by the two-attorney

firm—cannot justify the use of the multiplier. We disagree.

In *Blum,* the Supreme Court noted:

Neither complexity nor novelty of the issues ... is an appropriate factor in determining whether to increase the basic fee award.

... [The district court] may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was "exceptional."

*Blum,* 465 U.S. at 898–99, 104 S.Ct. at 1548–49 (citing *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940). The Court found that the factors of quality of representation, results obtained and novelty or complexity of the issues are satisfactorily accounted for by the reasonable hourly rate, and so ordinarily should not be used to justify an upward adjustment of the fee award except in unusual cases. *Blum,* 465 U.S. at 898–900, 104 S.Ct. at 1548–50. However, the district court aptly pointed out that the Court in *Blum* specifically declined to consider whether the contingent nature of the fee award could justify an upward fee adjustment. *Id.* at 901 n. 17, 104 S.Ct. at 1550 n. 17.

In *Davis,* 742 F.2d at 924, we held that there must be a basis for the upward adjustment. The district court, after noting that several circuits had held in post-*Blum* decisions that the contingent nature of the fee could justify the increase, *see La Duke v. Nelson,* 762 F.2d 1318 (9th Cir.1985), *modified,* 796 F.2d 309 (1986); *Sierra Club v. Clark,* 755 F.2d 608 (8th Cir.1985); *Wildman v. Lerner Stores Corp.* 771 F.2d 605 (1st Cir.1985); *Jones v. Central Soya Co., Inc.,* 748 F.2d 586 (11th Cir.1984), held that the contingency fee arrangement and the fact that counsel worked in a two-person firm justified the multiplier. We agree.

The contingent fee arrangement justifies the use of the multiplier. In *Wildman,* 771 F.2d at 612, the court correctly stated that the lodestar figure does not differentiate between a case taken on full retainer and one in which the "attorney spends many hours over a period of months or years with no assurance of any pay if the suit is unsuccessful." Also, a contingent fee attorney may incur substantial expenses in the preparation and litigation of an action. Thus, "[t]o deny all consideration of the added burden and additional risks an attorney under the contingent fee agreement may have to bear does not strike us as 'reasonable.' " *Id.* at 613.

 In addition, the fact that counsel worked in a two-person firm is relevant. As the district court stated, "[e]ssentially all of the work on the case was performed by him.... As a result, plaintiff's counsel had to forego a substantial amount of other work at considerable expense to his small firm." Joint Appendix at 97.

Accordingly, for the reasons set forth above, we **affirm** the judgment of Judge Julia Smith Gibbons.

WELLFORD, Circuit Judge, concurring in part and dissenting in part:

Giving plaintiff the full benefit of favorable inferences from the proof in this case, I concur that the jury could have found, despite Fite's generally mediocre to poor employment record and the difficult economic circumstances of defendant, First Tennessee Production Credit Association (FTPCA), that age was a factor in Fite's termination. I do not, therefore, disagree that the jury could have "reasonably concluded that FTPCA's performance argument was a mere pretext." Slip op. at 12. There was certainly evidence to the contrary, but ADEA gives claimant the right to a jury determination of legitimate factual disputes.

My disagreement in this case lies first with the damage award. Plaintiff conceded that he did not attempt to find other employment, temporary or otherwise, for over a year after his termination. At the time of trial, moreover, he had secured employment and was earning nearly $11,-

000 a year exclusive of other job benefits.[1] Fite, of course, had the unquestioned duty to mitigate his damages and for a year he had made no effort to do this. Assuming that Fite would have continued to work for FTPCA, absent a factor of age discrimination, at the same salary, after reducing this to current value, the jury award was clearly excessive and must have erroneously included over $33,000 in "thrift premium money" which Fite claimed as damages because he was forced to expend this fund as a result of his termination and over $13,000 which Fite claimed for three years' lost interest on the thrift plan. The jury's inclusion of these two sums is equivalent to adding to an ADEA damage award either the amount of a claimant's savings account or the total value of other assets which the claimant exhausted because of an allegedly discriminatory discharge. There is no basis in law for such an allowance.

In addition, after his termination, Fite was receiving more than $5,500 in annual early retirement benefits he would not have received but for this early discharge. (He claimed that had he retired at the prescribed retirement age, he would have then received considerably more than this, but the $5,500 received annually should have been offset against the claimed loss of an annual $28,000 salary.) Fite cannot have it both ways. He cannot claim the full salary loss and the loss of anticipated retirement benefits without taking into account the benefits he did and would receive between 1984 amd 1991. No evidence of life expectancy was presented to give the jury guidance about loss of earnings due to work life expectancy.

There was, moreover, abundant evidence that other senior FTPCA employees were faced with the choice of early retirement or demotion during the 1983–84 period due to economic distress of FTPCA. There was, then, evidence questioning the continued viability of the FTPCA operation during the time in question and whether Fite, or any other senior employee, could continue at the same salary in light of mounting losses. In sum, I find the jury award to be grossly excessive and speculative. It should have been subject to a remittitur or reduction of *at least* one-fourth to one-third in order to avoid a new trial on the question of damages.[2]

The award is disproportionate to the amount of the "front end" award made in *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916 (6th Cir.1984), which stated that "an award of front pay must be governed by the sound discretion of the trial court and may not be appropriate in all cases."[3] *Id.* at 923.

Finally, I disagree with and dissent from the attorney's fee award made in this case. In the first place, some of the hours spent in pursuit of unsuccessful claims or contentions against parties other than FTPCA should not have been allowed. Moreover, there is no justification for enhancing a "lodestar" award simply because plaintiff's counsel was practicing in a two person law office. No authority is cited for this novel proposition. That Fite's lawyer spent a large number of hours preparing the case simply means that he could not devote these hours to other clients. Thus, there certainly should not be a 75% increment based solely on the size of the attorney's practice. There can be no basis for awarding a lawyer in a very small firm an increment for legal services that a lawyer in a large firm would not receive merely because he worked in a large firm.

The other basis for an increase was the contingent fee arrangement the attorney had with his client. The fact that Fite agreed to pay a contingent fee means that as between Fite and his attorney, Fite may be liable for fees after the court's assessed

---

**1.** Fite classified this job as a temporary one.

**2.** I find $46,000 of claimed elements of damage (representing the thrift plan and interest thereon) to be clearly unallowable. There also should have been an offset for the salary Fite earned or reasonably expected to earn between 1984 and 1991.

**3.** As set out in my separate opinion in *Davis*, 742 F.2d at 924, I believe that a front end award in a case involving the circumstances here present, should be limited and should take into account the likelihood of other employment.

897

reasonable fees against FTPCA under ADEA. There was no statement by the district court that this case was unusual, novel, or complex with respect to the ADEA issues involved. It was, rather, a hard fought case with straightforward factual disputes that might have gone either way. The award was not in conformity with *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* — U.S. —, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), nor, I believe, with *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). *See also Dean v. Holiday Inns, Inc.,* 860 F.2d 670 (6th Cir.1988); *Contelin v. Lovely,* 834 F.2d 543 (6th Cir.1987). If a multiplier were appropriate in this case, something not borne out by the reasons articulated by the district court (no finding of novel issues, unusual complexity, or community resentment), I would consider a one-third multiplier factor to be generous. *See Delaware Valley,* 107 S.Ct. 3078.

Accordingly, I would reverse and remand on both the damages issue and the attorney's fee issue for the reasons stated.